UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

FILED

08 JUL 15 PM 3:48

RICHARD W. WIEKING
U.S. DISTRICT COURT
N. DIST. OF CALIFORNIA

DONALD JONES,

      Petitioner,

    v.

JAMES WALKER, Warden,

      Respondent.

No. _____

CV 08 3409 CW

PETITION FOR WRIT OF HABEAS
CORPUS (28 U.S.C. section 2254)

E-filing

Mark D. Greenberg
Attorney at Law
Cal. SBN 99726
484 Lake Park Avenue, No. 429
Oakland, CA 94610
(510) 452-3126

Attorney for Donald Jones, V77537
California State Prison, Sacramento
P.O. Box 29002
Represa, CA 95671-002

# TABLE OF CONTENTS

PETITION FOR A WRIT OF HABEAS CORPUS                         1

PRELIMINARAY ALLEGATIONS (I-III)                            1

SUMMARY OF EVIDENCE PRESENTED AT TRIAL (IV-V)    3

CLAIMS FOR RELIEF (VI)                                      11

    A.  Pretrial identification procedures were so impermissibly suggestive that the use of identification evidence at trial violated the Fourteenth Amendment of the United States Constitution.                         11

    B.  The restriction on Dr. Shomer's testimony at trial denied Petitioner his right under the Sixth and Fourteenth Amendments to a meaningful opportunity to present a defense.                              20

EXHAUSTION ALLEGATION (VII)                                21

PRAYER FOR RELIEF                                          22

VERIFICATION                                               23

# TABLE OF AUTHORITIES

## Cases

*Crane* v. *Kentucky*, 476 U.S. 683 (1986)                  20

*Neil* v. *Biggers*, 409 U.S. 188 (1972)                    12,19-20

*People* v. *Cash*, 28 Cal.4th 703 (2002)                   20

*Simmons* v. *United States*, 390 U.S. 377 (1968)           12

*Stovall* v. *Denno*, 388 U.S. 293 (1967)                   12

Mark D. Greenberg
Attorney at Law
Cal. SBN 99726
484 Lake Park Ave., No. 429
Oakland, CA 94610
(510) 452-3126

Attorney for Donald Jones, V-77537
California State Prison, Sacramento
P.O. Box 29002
Represa, CA 95671-002

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **DONALD JONES,** | No. _____ |
| **Petitioner,** | |
| **v.** | **PETITION FOR WRIT OF HABEAS CORPUS (28 U.S.C. section 2254)** |
| **JAMES WALKER, Warden,** | |
| **Respondent.** | |

Petitioner, through his counsel, files this petition pursuant to 28 U.S.C. section 2254 *et seq.*, and alleges as follows:

## PRELIMINARY ALLEGATIONS

### I.

Petitioner is currently confined at California State Prison, Sacramento in Represa California.

## II.

**A.** In an information filed on September 10, 2004, the District Attorney of Alameda County accused Larry Ridge and Petitioner, Petitioner, of two counts (1 and 5) of murder (§ 187) and three counts (2, 3, 4) of attempted murder. (§§ 664, 187.) Petitioner alone was accused (count 6) of possession of firearm by a felon (§ 120221(a)(1)). (1CT 219-228.)[1]  For the murder charged in count 1, a special circumstance for "drive-by" murder was alleged (§ 190.2(a)(21)), while both counts of murder were augmented by the special circumstance for multiple murder. (§ 190.2(a)(3).) For all the attempted murders charged, premeditation and deliberation were alleged. (§ 664(f).) On counts 1 through 5, arming enhancements (§ 12022(a)(1)) were alleged against Ridge, while life-term gun-use enhancements (§ 12022.53(d)) were alleged against petitioner. Finally, a prior prison term (§ 667.5(b)) for possession of a controlled substance (H&S Code, § 11350(a)) was alleged against petitioner only. (1CT 219-228)

**B.** On February 14, 2005, before jury selection began, Petitioner stipulated to his prior conviction for purposes of count 6 so as to obviate the necessity of proving this element to the jury. (2CT 283; ART 2/14/05, pp. 1-3.) At the close of the prosecution's case in chief, the trial court struck the life-term gun-use enhancements alleged in connection with counts 3 and 4. (6RT 1001.) On March 28, 2005, verdicts were returned. (CT 870-871.) Petitioner was found guilty on all counts; the two counts of murder were set at first-degree, and the remaining special allegations attached to each count were found true. (4CT 872-877.) Ridge was found guilty of all counts charged against him. However, the murder counts were set at second-degree, and the premeditation allegations were rejected on the attempted murders. The arming allegations were found true. (2CT 450-455.) On April 26, 2005, Petitioner was sentenced to three consecutive life terms, two of them without parole. (4RT 904; 4CT 908-911.)

---

[1]  Unless otherwise indicated, all statutory references are to the California Penal Code.

**C.** Petitioner appealed his conviction to the California Court of Appeal, First Appellate District, which, on January 30, 2007 affirmed his conviction while reduced one life-term to a determinate term of twenty years. On March 5, 2007, a petition for review was filed in the California Supreme Court, and review was denied on April 25, 2007.

### III.

The federal issues presented to the California Court of Appeals and the California Supreme Court were as follows: **A.**) pretrial identification procedures in petitioner's case were so impermissibly suggested as to give rise to a substantial likelihood of irreparable misidentification, and the allowing of identification evidence against petitioner violated his right to due process under the Fourteenth Amendment of the United States Constitution; **B.**) unreasonable restriction on petitioner's use of an expert denied him his right, under the Sixth and Fourteenth Amendments of the United States Constitution, to a meaningful opportunity to present a defense.

### SUMMARY OF EVIDENCE PRESENTED AT STATE TRIAL

### IV.

The following is a summary of the prosecution case at petitioner's state court trial:

The events of the evening of April 8, 2004, as established by the evidence presented by the prosecution, in broad outline had Petitioner driving around Oakland in his brother's van. His brother, Larry Ridge, was there, as were Ray Gilbert, and Gilbert's nephew (2RT 307), Ronnie Wilhite. After a stop to obtain an assault rifle, the group drove, at about 8:30 p.m., to the 600 block of 29th Street in Oakland, stopping in front of a driveway (4RT 860), where Petitioner, from the driver's seat, opened fire on a group of four young men, killing one of them, Thomas Simpson,

injuring another, Andre Stallings, and almost hitting Anthony Harris and Anthony Alonzo. There was some return fire, which wounded Larry Ridge, and killed Ray Gilbert, who was hit in the back as he sat in the passenger seat of the van. (2RT 330-332; 4RT 880, 896-897; 5RT 988.)

The case in more specific detail depended primarily on the testimony of Ronnie Wilhite, an accomplice, and on the identification evidence of Monique Young, a third-party witness, without any ostensible bias, but whose identification was much contested in this case.

Wilhite identified Petitioner as being at Ray Gilbert's house when Wilhite arrived there on the afternoon of April 8, 2004. Petitioner, Gilbert, Wilhite, and Ridge had all known each other for many years. (2RT 307-312.) Wilhite testified that he observed Petitioner making a cell phone call during this time. (2RT 313.)[2]

After Larry Ridge showed up with his van at about 4 or 5 p.m., all four left Gilbert's house with Petitioner driving. Again, there was the stop to obtain the assault rifle; the drive to 29th Avenue; and then the firing, which, according to Wilhite, was done by Petitioner through the driver's side window of the van. (2RT 313-318, 321-328.) As they drove off, Wilhite heard two shots in return fire. Ridge and Gilbert were hit. (2RT 330-332.)

Petitioner, turning left on Martin Luther King, sped off toward Highland Hospital. There, according to Wilhite, Petitioner jumped out of the van and ran off toward the emergency room, while Wilhite and Ridge tried to get the wounded Gilbert out of the van. Petitioner returned with a wheelchair for Gilbert. As Wilhite, accompanied by Ridge, pushed Gilbert toward the hospital, Petitioner drove off in the

---

[2]  Gilbert lived at 1507 1/2 48th Street in Oakland. (4RT 944.)

van. (2RT 332-336.) According to Wilhite, Petitioner, who usually wore his hair braided, had it unbraided that night. (2RT 337.)[3]

Monique Young, who was the registration clerk at Highland Hospital, testified that she was working the 4 p.m. to 12:30 a.m. shift on April 8, 2004. At her lunch break between 8 and 8:30 p.m., she went to move her car, which was parked on East 32nd Street, one block away from the hospital, which was on East 31st Street in Oakland. As she walked on Stuart Street toward East 32nd, she saw a white van driving fast in the opposite direction toward the hospital. (4RT 773-776.)

After she moved her car from East 32nd to Stuart, closer to the hospital, Monique walked back to work. She noticed the van was now parked on East 31st at the corner near the bus stop. The van was about 14 feet away from her as she was about to cross East 31st to return to the hospital. She noticed that both passenger side doors were open and two men were helping out a third man from the passenger side of the van. She could see someone was hurt, so she increased her pace to let them know inside the emergency room that a trauma was coming in. She glanced back quickly and, about 14 or 15 feet behind her, she noticed a fourth man starting across the street from the driver's side of the van. (4RT 776-782.)[4]

When Monique was halfway down the ramp that descended toward the entrance to the emergency room, the man passed her from behind, exclaiming, "Where is the emergency room? I need a wheelchair. I need a wheelchair." (4RT 782-783, 801.) Monique pointed to the wheelchairs at the end of the ramp. The man passed her;

---

[3]  The van was later found parked on Bancroft, not far from Ray Gilbert's house. (4RT 867-872.) Inside the van on the driver's seat there were expended shell casings that could have been fired from an assault rifle. There was  also blood on the right passenger seat. (3RT 506-508, 647-653; 4RT 873-874.)
[4]  The prosecution had Monique acknowledge that at the preliminary hearing she testified that she had actually seen the fourth man get out of the van on the driver's side. (4RT 791-792.) The prosecutor, however, sought no explanation for the discrepancy.

retrieved a chair; pushed it at a run back up the ramp; and passed her again as she walked into the hospital. (4RT 784-786, 801-802.)

According to Monique, the man who passed her on the way down was about 5-9, and weighed about 180 pounds. He was an African American, and had a mustache. His most striking feature, to her, was his hair, which looked uncombed and unbraided. (4RT 783-784, 827.)[5] At trial she identified Petitioner as the man she had seen for those few seconds on April 8, 2004. (4RT 786, 802.)

After Petitioner had passed her with the wheelchair, she did not see him again. She entered the emergency room, informed them of the trauma, and then returned outside to help. Three people were coming toward the hospital: one in the wheelchair; one pushing it; and one walking beside them, shouting, "I'm shot, I'm shot, I'm shot." (4RT 787-788, 805-806.)[6]

The prosecution also presented evidence of the cell phone use on April 8, 2004 for (916) 821-0103, which was the cell phone number registered to Petitioner. (4RT 702, 710.) When a cell phone call is made, it is relayed through the nearest available tower sending off the strongest signal. At 8:14 p.m. on April 8, a call was made that was relayed through the tower at 1099 Ashby Avenue in Berkeley, which was a nine minute drive from the 600 block of 29th Street, where the shooting occurred. (4RT

---

[5]  Petitioner's driver's license application dated January 22, 2004, showed him to be 6-1, 187 pounds. (Ex. 63; 4RT 981.)

[6]  Officer Keith Dodds might be added equivocally to the list of the prosecution's identification witnesses. Dodds had had known Petitioner since Petitioner was in junior high school. According to Dodds' initial testimony, he had seen Petitioner driving Ridge's van at about 4:30 p.m., within the week before April 8. (3RT 433-435.) Later, under Court questioning, Dodds asserted that in fact it was *on* April 8 at 4:30 p.m. (3RT 438-440.) However, what Dodds reported contemporaneously to Sergeant Ferguson on April 9 was that he had seen Petitioner driving the van "within the past week." Dodds never said anything about seeing Petitioner driving the van on the very day of the homicide, of which Dodds was aware almost immediately after it occurred. (3RT 441-444, 447-448; 4RT 929-931.)

718, 947.)  The next call was at 8:52 p.m. and was relayed from a tower in north Oakland; then another call at 9:05 p.m. was relayed from a tower at Coliseum Way, about 2.5 miles from Ray Gilbert's house.  (4RT 719-720, 944-945.)  Finally, based on 8 calls made between 10:53 and 11:32 p.m., a route could be traced from south Oakland, through the Caldecott Tunnel toward Walnut Creek, and then to Pittsburg.  (4RT 720-723.)  The relay tower in Pittsburg was a three minute drive from the apartment of Amelia Wilson, who was Larry Ridge's and Petitioner's mother.  (4RT 943-944.)

Finally, Petitioner was arrested in Stockton where he lived with his wife and son on May 13, 2004.  The officers from the fugitive unit encountered his wife in the parking lot of the complex.  They received an affirmative reply when they asked her if Petitioner was inside.  She relayed their request that he surrender himself, which he did without incident.  (4RT 765-771.)

## V.

The following is a summary of the evidence presented on behalf of the defense:

Ronnie Wilhite's testimony at trial was not his first version, or even second or third version, of the events of that evening.  He was interviewed on April 9, by Sergeant Ferguson.  He told Ferguson that he had happened to get off a bus at Highland Hospital and happened to encounter his uncle and Larry Ridge there by coincidence.  (2RT 368-370; 4RT 867.)  When Ferguson expressed his incredulity at this version, Wilhite admitted that there was a van involved; that his uncle, Ray Gilbert, had been driving it; that he himself was on the floor in the back, while Larry Ridge was in the front passenger seat.  They were riding around that evening when shots rang out and Larry said he was hit.  (2RT 371-372.)  When Ferguson still expressed disbelief, Wilhite announced that Ridge and Gilbert switched seats at one point, but then Wilhite revised the seating, insisting that in fact Ridge had been driving all along.  (2RT 372-373; 4RT 924-926.)  All this time, Wilhite made no mention of

7

Petitioner. (2RT 373.) It was only when Ferguson asked accusingly, "Are you sure you weren't driving the van?", that Wilhite answered, "Well, wait a minute. Actually a guy named Petitioner was driving the van." (2RT 373-374.) Even after naming Petitioner, Wilhite still had Ray Gilbert firing the rifle, and only in the final version of the story was Petitioner both driving and firing. (2RT 374-375; 4RT 928.)[7]

The mutability for Ronnie Wilhite's account had a motive suggested by Wilhite's reaction to the prospect of a GSR test to determine any powder residue on his hands from the firing of a gun. At the hospital, the police had sequestered Wilhite. An evidence technician explained to him the nature and purpose of the GSR test. As soon as the technician opened the kit, Wilhite began wiping his left hand across on his clothing and even withdrew the hand into his sleeve. The technician told him to stop. The test was done and turned out negative. Wilhite was left handed. (2RT 382-383; 3RT 582-584, 590-592; 4RT 841-844.)

As for Monique Young, there was much that was troubling about her identification of Petitioner as the man she saw passing her with the wheelchair in front of the emergency room at Highland Hospital. At the preliminary hearing in August 2004, she answered, "No," when asked if anyone in the courtroom looked familiar to her and if she saw there the man that was driving the van that night. (4RT 815.) She explained at the preliminary hearing, "Unless, unless he have – unless he had got a haircut. That's what I'm saying." (4RT 824.) Indeed, even at trial, she attested that the hairstyle made the greatest impression on her on April 8. (4RT 827.) She further explained at trial that Petitioner's hair, both at the preliminary hearing now, was close-cropped, and was very different than it was at the hospital. (4RT 792-795.)

However, before trial, and three months after the preliminary hearing, in November 2004, Monique met with the prosecutor, who showed her two photographs

---

[7] In all the pre-trial permutations of his account, Wilhite consistently maintained that the van was fired on before anyone returned fire from the van. At trial was the first time he attested to the aggression coming from the van. (2RT 377.)

8

with the face covered by a stick'em note. One photograph showed a braided hairstyle and one showed a short "Afro" hairstyle. Monique stated that the man she had seen at the hospital did not have those hairstyles. When the prosecutor removed the stick'em notes from the faces, she recognized the man's face. Both photographs were of Petitioner. (Exs. 4 and 5; 4RT 795-798, 818-819.)

Apart from the fact that in November, 2004, the difference in hairstyle did not seem to be a fatal variable as it was in August, 2004, Monique herself related her recognition of Petitioner's face on the photographs to the preliminary hearing. In November, 2004, she expressly stated that the photo showed the same man she had seen at the preliminary hearing. She also conceded that at the preliminary hearing she had doubts in her mind. Her doubts, however, were completely dispelled from the photos she was shown in November. (4RT 819, 821, 826-827.)

Some measure of her capacity to recall could be derived from her inability to identify any of the other men from the van. Notably, she was unable to give any description of Ray Gilbert, even though she was very close to him, even holding his legs to keep him from sliding out of the wheelchair. (4RT 805-806.) This was notable, not only because opportunity this situation presented for observation, but also because Gilbert, who was 5-9, weighed 271 pounds. (4RT 988.) By contrast, Monique herself admitted she had observed the man who passed her only for a matter of seconds (4RT 802), and although she denied that he had startled her when he ran past (4RT 802), she had told the prosecutor, in the November, 2004 interview, that she had in fact been startled by him. (5RT 996.)

Monique of course had no motive to fabricate or any specific interest in the instant case. But there was evidence to suggest that her fidelity to an exacting measure of truth was not high, and that she might be indifferent to the forensic precision required in a courtroom. Monique had a 1999 conviction for giving false information to police officers, and a conviction for grand theft. (4RT 821.)

9

1    Apart from the impeachment of prosecution eyewitnesses, the defense presented

2    affirmatively, Dr. Robert Shomer, a forensic psychologist and an expert in the

3    psychology of eyewitness identification. (5RT 1103-1104.) According to Dr. Shomer,

4    extensive studies have established the high rate of inaccuracy and unreliability in the

5    eyewitness identification of strangers. Unlike the identification of persons with whom

6    the witness is intimate, friendly, or acquainted, the identification of strangers is at the

7    mercy of the opportunity to observe and the physical conditions in which observation

8    occur. The problem is compounded by the decay of memory, which occurs in all

9    cases, and which can be deceived by later influences, such as police interviews or other

10   procedures that might, even inadvertently, be suggestive. Memory, which cannot be

11   compartmentalized, will tend to confuse details and meld them into new combinations

12   with the witness being aware of this. Thus, it can happen that when the witness, over

13   time, thinks he or she remembers more details, he or she in fact remembers less. For

14   these reasons, law enforcement across the country has reformed their identification

15   procedures in order to minimize problems. One of the most common methods is the

16   use of the physical or photo lineup, usually with six alternatives, chosen so as to be

17   similar without being overly similar. (5RT 1107-1119, 1129-1130.)

18   Studies have also been done regarding the relationship between the witness's

19   confidence in his or her identification and the accuracy and reliability of the

20   identification. It has been shown that there is in fact no necessary relationship. The

21   final courtroom identification is the end of the a long process in which the eyewitness

22   has become more committed to what began as a tentative identification. The

23   acquisition, in the drawn-out legal process, of further information also has the

24   tendency to dispel initial doubts. By the time the witness is brought to the courtroom,

25   his or her belief in the identification has become firmly so firmly ingrained as to

26   inspire confidence without assuring accuracy or reliability. (5RT 1121-1124.)

27   The defense presented several alibi witnesses. Petitioner's mother lived in

28   Pittsburg, and on April 8 her extended family gathered at her house because she had

10

just got out of the hospital where she was treated for kidney trouble. The family was having a barbecue that night, and Petitioner was there with his one-year old son. This was attested by Carol Ferguson, Petitioner's wife, by Laquesa Wilson, his half-sister, and Darnell Barr, his 12-year-old nephew, whom Petitioner was teaching to play chess when the call came informing the family that Larry Ridge had been shot and was at Highland Hospital. (5RT 1045-1049, 1168-1174, 1177-1178, 1187-1195.)

The cell phone registered in Petitioner's name was Carol's phone, which Petitioner obtained for her when Metro PCS had a sale about two years before April 8, 2004. (5RT 1053-1054.) She had not stayed in Pittsburg with Petitioner and her son, but went back to Stockton and, after work on April 7, she headed toward Oakland to go to Buffalo Exchange to sell clothes, and to visit her family. She had her cell phone with her. (5RT 1048-1054.) Zinata Petitioner, Petitioner's sister, had been shopping at a grocery store in Bay Point near Antioch when Ronnie Wilhite, telephoned her on her cell phone, telling her that she should get down to Highland Hospital because her brother, Larry, and Ray Gilbert had been shot. (5RT 1139-1143, 1162-1165.) Zinata, before heading to Oakland, telephoned Carol, asking her to go to Highland to check to see if Larry was all right. (5RT 1053, 1055.) Carol proceeded to Highland, checked and saw that Larry was all right, telephoned the house in Pittsburg and relayed the news, and then left the hospital after having spent about an hour there, and after Zinata appeared. (5RT 1056-1061, 1063.)

From Highland Hospital, Carol drove back to her mother's house, where she got on the freeway, taking 580 to 24 through the Caldecott Tunnel and then to Pittsburg. She was receiving cell phone calls all this time, but they were bad connections. She arrived in Pittsburg about 11 p.m. or midnight, and spent the night, sleeping with her husband on the floor of the living room. (5RT 1063-1065.)

Finally, Ralph Redus testified for the defense. Redus knew Petitioner, Ridge, Wilhite, and Gilbert. On April 8, 2004, at about 7:30 p.m., Redus was leaving his sister's house in West Oakland. As Redus was heading to a nearby store that was only

11

four blocks away from 29th Street and Martin Luther King, he saw his friends Ray Gilbert and Ronnie Wilhite sitting in a white van. He walked over to socialize, and the three men smoked some of Wilhite's marijuana for three or four minutes. Wilhite, according to Redus, stated that he, Wilhite, and Gilbert were headed home. Redus saw neither Petitioner nor Ridge that night. (5RT 1015-1022.)

## CLAIMS FOR RELIEF

## VI.

**A. Pretrial identification procedures were so impermissibly suggestive that the use of identification evidence at trial violated the Fourteenth Amendment of the United States Constitution.**

1. It is clearly settled constitutional law as established by the Supreme Court of the United States that a conviction based on eyewitness identification at trial will constitute a denial of due process, if the pretrial identification procedures were so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. (*Stovall* v. *Denno*, 388 U.S. 293, 301-302 (1967); *Simmons* v. *United States*, 390 U.S. 377, 384 (1968).) The constitutional inquiry into the validity of an identification requires two steps: first, it must be determined whether the pretrial identification or viewing was impermissibly suggestive and unnecessary, and if so, whether the identification itself was nonetheless reliable under the totality of circumstances. (*Neil* v. *Biggers*, 409 U.S. 188, 199-200 (1972).) The factors to consider in this regard are such maters as the witness's opportunity to observe the suspect, the witness's degree of attention in so doing, the accuracy of the witness's prior descriptions of the suspect, the level of certainty displayed by the witness at the suggestive confrontation, and the lapse of time between the initial observation and the subsequent identification. (*Ibid.*)

2. Petitioner, *in limine* of trial, moved to suppress Monique Young's identification testimony against him based on the preceding constitutional principles. After an extensive evidentiary hearing, the trial court denied the motion to suppress, finding that the identification procedures used in this case were indeed unduly suggestive, but that her in-court identification of Petitioner was nonetheless the product of her independent recollection of the events of April 8. (1RT 206-210.)

3. The evidence before the Court on the issue of suppression was as follows: The signed statement Monique gave to Officer Arvisu on April 8, 2004 at about 11:30 p.m., was before the court. (Jones Ex. A; 1RT 71; see 2CT 259.) The description she gave of the man she had seen was quoted by Arvisu: "'The male black was about 20-21 years old, 5-8, 175 lbs. – 180 lbs., with a medium complexion. His hair was about ear length and it looked like he had just taken out his braids. He was wearing a dark coat and a dark pair of pants.'" (Jones Ex. A; see 2CT 259.) She further told Arvisu that "'[i]f I saw the driver I could ID him." (Jones Ex. A; see 2CT 260.)

4. Monique's first opportunity to make an identification occurred on August 27, 2004 when she testified at the preliminary hearing, a transcript of which was before the trial court for purposes of the motion to suppress. (1RT 207.) In her preliminary hearing testimony, Monique first gave a description of the man she had seen on April 8. This description was substantially the same as the one she had given Officer Arvisu. (1CT 31-33), and she acknowledged also that she had told Arvisu that she could identify the man if she saw him again. (1CT 43.) The following then occurred on direct examination:

"Q. Is there anyone in the courtroom that looks familiar to you or looks like the person that you saw getting out of the driver's door?

"A. Um, no, because the person I seen had hair on his head. So I don't remember.

13

"Q. Okay. So you don't see anyone in the courtroom that looks familiar because you don't see anyone with the same type of hair?

"A. Right.

"MR. BERGER [attorney for Larry Ridge]: Object. This is leading.

"THE COURT: Overruled.

"MS. WALSH [the prosecutor]: Q. You can answer.

"A. Unless – unless one of the guys had a haircut, then look familiar, the face, um hmm.

"THE COURT: Mr. Swinderman, could you read the answer back. (record read)

"MS. WASLH: Okay. Just to be clear, no one in the courtroom looks like the guy that got out of the driver's door because no one in the courtroom has that same type of hairstyle; is that what you're saying?

A. The guy look familiar unless he have – unless he had got a haircut. That's what I'm saying." (1CT 43-44.)

Monique was also unable to identify any of the other men she had seen in connection with this incident. (1CT 44.)

5. On cross-examination by Ridge's attorney, Monique asserted that the most significant feature about the driver was his hair. (1CT 51.) She saw him running and his hair was going in every direction. Then:

"Q. But aside from the hairstyle, there's nothing that terribly stands out about his characteristics, right?

"A. I just remember him being brown skinned. I remember him having like a little like mustache." (1CT 51.)

6. In November, 2004, the District Attorney's office contacted Monique and asked her to come in for an interview because she might have to testify again. (IRT 186-187.) The interview took place at the courthouse on November 18 and was conducted by the new prosecutor in the case, Mr. Lowe, and witnessed by his investigator Earl Sherman. (IRT 57-58.) The description she gave in this interview was that the man who had passed her was about six feet tall, of medium build, and medium complexion. His hair was about ear-length and appeared to have been taken out of braids. The man also had a thin mustache. (Jones Ex. B; IRT 61, 108-109; see 2CT 267.)

7. At this point, Mr. Lowe announced that he would show her some photographs, and she was to look at the hairstyle "to see what you think." (IRT 112.) He produced a single photograph with the face of the subject covered by a stick'em note. The exposed hairstyle, however, was not, according to Monique the same that she had seen on April 8. The hair was not in braids, as in the photograph, but in undone braids and was sticking out all over the place. (Jones Ex. B; IRT 66, 68, 113; see 2CT 267.) Lowe then removed the stick'em note. After a few seconds, she stated that that was the man she had seen at the hospital, and specifically referred to the mustache as distinctive in her memory. (Jones Ex. B; IRT 91, 113-114.) The photograph shown to Monique was a booking photo from Petitioner's arrest in this case on May 13, 2004. (Ex. 4; IRT 109-110.)

8. Mr. Lowe then produced another photograph with the face covered. This time, the hair was in an "Afro" style. She stated that the subject's hair on April 8 was not in this style but was longer and straighter. When Lowe removed the stick'em, Young stated that this was the person she had seen at the preliminary hearing. She also recognized him as the subject of the previous photograph. Finally, she stated that the person she saw at the preliminary hearing had short hair, substantially different than

the hair shown to her in either photograph. (Jones Ex. B; Ex. 5; IRT 94, 115-116.) Exhibit 5 was a booking photograph of Petitioner from an arrest that occurred on May 9, 2003, showing him with a relatively short "Afro." (Ex. 5; 1RT 109.)[8]

9. Dr. Shomer also testified at the suppression hearing. He not only gave the generalized testimony, consistent with his testimony at trial, but also pronounced his opinion on the actual procedures that occurred in this case. Dr. Shomer reviewed Monique's statements to the police, the report on the November 18 interview, and the transcript of her preliminary hearing testimony. (RT 2/16/05, p. 23.) In Shomer's opinion, the procedure of November 18 was unduly suggestive, communicating implicitly the prosecutor's strong suspicions that Petitioner was the person in question despite Monique's previous failure to identify him at the preliminary hearing. (RT 2/16/05, p. 23.)

10. In support of this conclusion, Dr. Shomer noted that once the inconsistency of hairstyle was established, it was unnecessary to reveal the face on the photographs, which were of the same subject in both photographs and was the same person, or at least one of the same persons, she saw as the defendant at the preliminary hearing. (RT 2/16/05, pp. 24-26, 32-33.) Further, there was little or not "supporting context" to vouchsafe the reliability of her identification by means of this suggestive procedure. The man she had seen on April 8 was a stranger to her; she testified that she did not pay attention to his face; their interaction was brief; her observations occurred in an emergency situation; and she focused on a detail, i.e., the mustache, which, when she saw in the photograph might give the illusion of an overall match – and even this detail was suspect since appeared for the first time almost as an afterthought on cross-examination at the preliminary hearing. (RT 2/16/05, pp. 24-25, 28-29, 30-31.) Finally, to be considered in conjunction with all these factors was the lapse of time.

---

[8]  Lowe had nine booking photos from different dates ranging from January, 2002 through the last photo of May 13, 2004. He chose two of these. (Jones Ex. C; 1RT 109-110.)

From the initial observations on April 8 to the preliminary hearing was a passage of four months, at which time she was unable to make an identification. From the preliminary hearing to the interview of November 18 was another three months. Seven months was an enormous stretch of time to retain accuracy about the face of a stranger. (RT 2/16/05, pp. 25-26.) In sum, as Shomer opined, an independent identification was now impossible for Monique Young. "[A]ny subsequent opportunity in court to obtain an identification would inevitably and inextricably be the fruit of the previous procedure or the previous opportunity." (RT 2/5/05, p. 33.)

11. The last witness to testify at the suppression hearing was Monique Young herself. She testified consistently as she would at trial as to what she had been doing and what she had observed on the evening of April 8, how she had been returning from reparking her car, how the man passed her as she descended the driveway to the emergency room, how he was African-American, about 5-9, weighing 180 pounds, and how his hair was unbraided and unkempt. (1RT 148-154.) At this point in the direct examination, she made no mention of a mustache. However, when recounting what happened at the preliminary hearing, she testified that Petitioner's different haircut threw her off "a little." But what rendered him recognizable at the preliminary hearing was his mustache. (1RT 155-156.) She acknowledged that the same man was there in court today, and she identified Petitioner, even though his hair was now similar to the way it was at the preliminary hearing. (1RT 155-158.) As to the meeting with the District Attorney on November 18, she recognized the person in the photographs from her recollection of him at the hospital on April 8. (1RT 158-159.)

12. On cross-examination, she attested that as she descended the driveway, her back was to the approaching man and, unlike her trial testimony, she averred that he had startled her. (1RT 168-169.) When the man grabbed a wheelchair and started pushing it up the ramp, she did not remember whether or not he kept his head down. She also averred that she was not particularly trying to look at him, and this was the last she saw of him. (1RT 170-172.) As to the other persons, the man in the

17

wheelchair, the man pushing the wheelchair back to the emergency room, and the man crying that he too was shot, she could not identify these men or even describe their physical features. (1RT 172-174.)

13. As to the November 18 interview, according to Monique, she was shown two photographs with, at first, the hair covered up. When asked if she recognized the faces, she said that she did. When Mr. Lowe removed the stick'em notes, she stated that the hairstyles were not the same as she had seen. (1RT 188-192, 193-194.)[9] Under court questioning, Monique stated that she recognized the face in the photographs as the face she had seen at the hospital. (1RT 194-195.) As to uncertainty at he preliminary hearing, " . . . . Like what I was saying about at the hearing, that I was like – I seen him, but I was just like he must have got a haircut. That was the same person. I just kept looking. That looks like the same person, unless he got a haircut. Then when I seen the photos that Mr. Lowe showed me, I was like that's the same person." (1RT 195-196.) Again, it was the mustache that stood out for her on November 18, even though at the preliminary hearing, she saw Petitioner with the same mustache. (1RT 200.)

14. This then was the evidence presented at the evidentiary hearing. It was from this that the court concluded that although the November 18 procedure was impermissibly suggestive, the court nonetheless believed that she in fact did recognize Petitioner at the preliminary hearing, and that her recollection of his face was not the product of the suggestive procedure on November 18. Again, the motion to suppress was denied. (1RT 207-210.)

15. The Court's finding that impermissibly suggestive procedures were used is not contested. The trial court's assessment that Monique Young had an independent recollection is not supported by the undisputed evidence.

---

[9] The trial court found that the version of the interview given by Mr. Lowe and Mr. Sherman was more believable than the one given by Monique Young. (1RT 206-207.)

16. The factors listed in *Neil* v. *Biggers*, *supra*, 409 U.S. 188, 199-200 may usefully guide the evaluation of the trial court's ruling. 1) As to Monique's opportunity to view the man on the ramp, this was not long or extensive. She herself testified that he approached from behind and startled her. When he returned back up the driveway with the wheelchair, she could not remember whether his head was down or not. After she passed him, she never saw him again. 2) Monique's degree of attention in regard to observing the face was not high. She herself testified that she was not focusing on the man's face. The situation also presented to her an emergency in which she saw her primary task at hand was to get into the emergency room quickly and inform the nurses and doctors of the coming trauma patient. That her attention was focused on this is further vouchsafed by the fact that she could not even describe in general terms Ray Gilbert, whom she was close to and helping to stay in his wheelchair. Finally, her focus was clearly on the man's hairstyle rather than his face. The mustache, perhaps was noticeable, but she had never mentioned it to the officers on April 8 or in her direct testimony at the preliminary hearing. 3) The accuracy of her prior descriptions reflect on her identification only in a neutral manner. There were variations in this description, such as height, age, and weight, but types of characteristics are highly impressionistic. By the same token, they are so broad as to vouchsafe very little in regard to accuracy. Similarly, she was consistent at all times about the hair, which is still a broad and mutable category, and has little to do with the face. The mustache was, perhaps, a consistent feature, but was a suspiciously belated addition to her description of the man. 4) The level of certainty expressed by Monique at the suggestive confrontation does not here vouchsafe accuracy since she had already seen Petitioner at the preliminary hearing under suggestive circumstances. More significantly, she was not at all certain of him at the preliminary hearing. 5) The length of time between the initial observation on April 8 and the suggestive confrontation on November 18 was seven months. As Dr. Shomer testified, and as commonsense itself confirms, seven months is a long time to remember the features of

19

a stranger whom one had seen for a few brief moments under more or less stressful conditions.

17. Thus, of the five *Biggers* factors, four strongly point in the direction of a substantial likelihood of irreparable misidentification. Only one, the consistency of prior descriptions, does not strongly point in that direction, but it also does not strongly point in the direction of an independent recollection. Again, Monique described the man she had seen in broad impressionistic categories so comprehensive that consistency was as much the sign of their mediocrity as it was of Monique's memory.

18. Monique Young's testimony identifying Petitioner at trial was used in violation of the Fourteenth Amendment, and without this testimony, Petitioner would have been acquitted of all charges.

**B. The restriction on Dr. Shomer's testimony at trial denied Petitioner his right under the Sixth and Fourteenth Amendments to a meaningful opportunity to present a defense.**

1. It is clear constitutional law as established by the United States Supreme Court that the Sixth and Fourteenth Amendments extend to the criminal defendant the right to a meaningful opportunity to present a defense. (*Crane* v. *Kentucky*, 476 U.S. 683, 690-691 (1986); *People* v. *Cash*, 28 Cal.4th 703, 727 (2002).)

2. In paragraphs **VI.A.9** and **VI.A.10** above, Dr. Shomer's testimony at the suppression hearing was summarized. At the suppression hearing, Shomer gave a very specific opinion that Monique Young's identification of Petitioner was inextricable from the suggestive procedures used in this case. At trial, however, Shomer testified only to a generalized account of the psychology of eyewitness identification. Dr. Shomer was not allowed to testify about the psychological factors that Shomer believed actually bore on Monique Young's actual identification. All attempts by defense counsel to elicit this was barred by the trial court. (5RT 1120-1121, 1125-1127.)

3. Dr. Shomer's testimony regarding Monique Young's actual identification would have been significant and decisive. Without it, the jurors were deprived of impeachment evidence so strongly favorable to the defense that the suppression of this evidence constituted a substantial injustice.

## EXHAUSTION ALLEGATION

## VII.

1. All claims for relief presented in this petition have been presented both to the California Court of Appeal and to the California Supreme Court, and all state remedies have been exhausted. No other petition or appeal is currently pending in any court in regard to the judgment of conviction now under attack.

2. However, if this Court deems that any claim for relief presented in this petition has not been exhausted, Petitioner would request that proceedings in this Court be stayed and held in abeyance pending Petitioner's seeking of relief in the California Supreme Court for any unexhausted claim.

# PRAYER FOR RELIEF

**Wherefore,** petitioner prays that this Court grant him the relief to which he may be entitled in this proceeding, and if to do so, proceedings must be stayed and held in abeyance pending state exhaustion of any unexhausted claim, petitioner would request that this also be granted.

Dated:  July 14, 2008

Respectfully submitted,

Mark D. Greenberg
Attorney for Petitioner

## VERFICATION

I, Mark D. Greenberg, declare:

I am attorney for petitioner in the above-titled action. I have read the foregoing allegations contained in this petition for a writ of habeas corpus. These allegations and representations are, of my knowledge true and correct. My offices are in Alameda County; consequently, I am making this verification in place of petitioner because petitioner is incarcerated in Sacramento County, and for that reason cannot personally make this verification.

I declare under penalty of perjury that this declaration is true and correct and was executed on July 14, 2008 at Oakland, California.


_____
Mark D. Greenberg
Attorney for Petitioner

The undersigned certifies that he is an active member of the State Bar of California, not a party to the within action, and his business address is 484 Lake Park Ave., No. 429, Oakland, California; that he served a copy of the following documents:

FEDERAL PETITION FOR A WRIT OF HABEAS CORPUS

by placing same in a sealed envelope, fully prepaying the postage thereon, and depositing said envelope in the United States mail at Oakland, California on July 14, 2008, addressed as follows.

California Attorney General
455 Golden Gate Boulevard, Ste. 11000
San Francisco, CA 94102-3664

Donald Jones, V77537
California State Prison, Sacramento
P.O. Box 29002
Represa, CA 95671-002

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on July 14, 2008 at Oakland, CA 94610

Mark D. Greenberg
Attorney at Law