IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD JONES, | No. C 08-3409 CW |
|     Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
|   v. | |
| JAMES WALKER, Warden, | |
|     Respondent. | |

    On July 15, 2008, Petitioner Donald Jones, through his counsel, filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the admission of identification evidence and the exclusion of expert testimony at his trial.

    On October 23, 2008, Respondent James Walker filed an answer. Petitioner filed a traverse on December 17, 2008. Having considered all of the papers filed by the parties, the Court DENIES the petition.

BACKGROUND

I.  Procedural History

On March 28, 2005, an Alameda County jury convicted Petitioner of the special circumstance drive-by murder of fifteen-year-old Thomas Simpson, and the attempted murders of Andre Stallings, Anthony Harris and Anthony Alonso.  The jury also convicted Petitioner of the special circumstance murder of his accomplice Ray Gilbert, who was seated in the passenger side of Jones's van and was fatally wounded by return fire.  On April 26, 2005, the Alameda County superior court sentenced Petitioner to two consecutive life terms without the possibility of parole for the Simpson and Gilbert murders, plus a third consecutive life sentence for the attempted murder of Andre Stallings.  Separate consecutive life-term gun use enhancements for the murders were also imposed, as was a twenty-year determinate term gun use enhancement for the attempted murder of Andre Stallings.  Sentences for the remaining attempted murder counts and gun use enhancements were set to run concurrently.

Petitioner, along with co-defendant Larry Ridge, timely appealed to the California court of appeal.  In an unpublished opinion filed on January 30, 2007, the appellate court affirmed the judgment of conviction but reduced the life-term gun use enhancement for the murder of accomplice Ray Gilbert to a twenty-year determinate term because of a conceded instructional error.  People v. Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *47 (Cal.App. Jan. 30, 2007).  On April 25, 2007, the California Supreme Court denied review of a petition containing the two claims raised by Petitioner in this federal habeas corpus petition.

2

1  II.  Statement of Facts

2      The factual background of Petitioner's conviction was
3  summarized by the state appellate court as set forth below:

   FACTS

   On April 8, 2004, around 8:30 p.m., a barrage of assault
   rifle fire ripped through a group of four teenage boys as
   they stood talking at Martin Luther King Jr. Drive and 29th
   Avenue in Oakland.  One boy died, and another was injured.
   The rifle shots came from a van, and someone on the street
   returned gunfire that penetrated the van.  Shortly after the
   shooting, defendant Ridge and two other men were dropped off
   by a van driver at a nearby hospital where Ridge and one of
   the men, Ray Gilbert, were treated for gunshot wounds.
   Gilbert died.  Ridge's van was soon found by the police with
   a bullet hole through the driver's side and a bloodied
   passenger seat.

   There was no dispute at trial that defendant Ridge's van was
   used in the fatal drive-by shooting, and that Ridge and
   Gilbert were present at the shooting and hit by return fire
   from the street.  The only issues were the identity of the
   van driver who fired the rifle, and the complicity of the van
   passengers. [FN1 omitted.]

   I. PROSECUTION WITNESS RONNIE WILHITE

   The most complete description of the events came from a
   friend of defendants who placed himself and defendants at the
   shooting, and identified defendant Jones as the shooter.  The
   friend, Ronnie Wilhite, testified that he had been "hanging
   out" with defendants at his uncle Ray Gilbert's house in
   Oakland on the afternoon of April 8, 2004.  Defendants Jones
   and Ridge are brothers, and were friends of Wilhite and his
   uncle.

   Wilhite was a reluctant witness, and his testimony about the
   day is sketchy when it comes to the group's aims and
   intentions.  According to Wilhite, he arrived at Gilbert's
   house around noon.  Defendant Jones was at the house when
   Wilhite arrived, and defendant Ridge came to the house a
   couple hours later in his van.  The four men did "nothing."
   The men did not talk or interact; they were just watching
   television and "hanging out."  All but Wilhite drank brandy
   from a bottle that was passed around.

   Wilhite testified that there was no discussion about leaving
   the house, but "just one thing led to another, and we just
   left."  The men entered Ridge's van around 5:00 p.m.  Wilhite
   said his only understanding was that they would "just ride."
   Jones took the driver's seat, and Gilbert was in the front
   passenger seat.  Ridge was seated behind the driver, and

Wilhite sat on the floor behind the passenger seat. Wilhite testified that the men did not discuss why Jones was driving Ridge's van. According to Wilhite, there was no conversation at all among the men.

On entering the van, Wilhite saw a revolver sitting in the middle of the floor. The men drove from East Oakland to West Oakland without discussion. All but Wilhite continued to drink brandy from a bottle. Wilhite never asked Jones where they were going, or what they were doing. After driving around for about two hours, Jones stopped the van and left for a couple minutes, then returned with an assault rifle. Jones set the rifle down between the front seats. Wilhite testified that no one in the van said anything to Jones about the rifle. Wilhite was asked at trial if he was surprised to see Jones with a gun and Wilhite said, "[n]ot really." When asked why he was not surprised, Wilhite said, "I don't know. No reason." Jones continued driving, and drove for another 30 minutes during which time no one spoke.

Jones then stopped the van on 29th Street in West Oakland, picked up the rifle, and started firing it in rapid succession out the driver's side window. Wilhite lay on the van floor when Jones started shooting, while the other passengers remained seated. Wilhite heard Jones fire 10 to 15 shots, then heard a couple shots fired from the street in return. Ridge said, "I'm hit," and Jones drove away on Martin Luther King Jr. Drive as Wilhite tried to get a response from front seat passenger Ray Gilbert, who seemed badly hurt. Jones and Ridge argued as Ridge complained about being hit, and Jones told Ridge to "shut up."

Jones drove to the corner of Highland Hospital, jumped out of the van, ran across the street to the emergency room, and returned with a wheelchair. Wilhite and Ridge exited the van on the passenger side, and Wilhite saw that Gilbert had a bullet hole in the back. Wilhite put Gilbert in the wheelchair and pushed him across the street to the hospital. Ridge also entered the hospital, while Jones drove away in the van. Gilbert died from the bullet wound.

The police questioned Wilhite, who eventually admitted the drive-by shooting and identified Jones as the shooter. At trial, Wilhite explained that he initially denied involvement in the shooting because he feared for his life if he "snitch[ed]."

II. PROSECUTION WITNESS MONIQUE YOUNG

Wilhite's identification of defendant Jones as the van driver was corroborated by a hospital registration clerk, Monique Young. Young testified that she was outside the hospital on a meal break around 8:30 p.m. on April 8, 2004, when she saw a van speeding toward the hospital. Young was shown a photograph of Ridge's van, and she said it looked like the

4

van she saw that night.  The van parked across from the hospital.  Young saw two men helping a third man on the passenger side of the van.  The men were African-American.  Another man came running from the driver's side and came alongside Young.  The man was close enough to touch.  He asked, "where's emergency?" and told Young he needed a wheelchair.  Young pointed to the wheelchairs and the man ran ahead, grabbed one, and returned past Young toward the van.  Young described the man as African-American, wearing dark clothes, about five feet nine inches tall and 180 pounds in weight, with a mustache and straight uncombed hair standing on end that looked like it had been braided recently.  At trial, Young identified defendant Jones as the man at the hospital who came from the driver's side of the van.

Young also testified at trial about her previous efforts at identifying the van driver.  Young provided a description to the police on the night of the shooting, and told the police that she could probably identify the driver if she saw him again.  At the preliminary hearing in August 2004, seven months before trial, Young did not make a positive identification.  When asked if she saw the van driver in court, Young said: "Oh no, because the person I['d] seen had hair on his head, so I don't remember."  The examiner said: "Okay. So you don't see anyone in the courtroom that looks familiar, because you don't see anybody with the same type of hair?"  Young answered: "Right."  Young also said: "Unless, unless one of the guys [referring to the two defendants] had a haircut, then look familiar, the face, uh-huh."  Young was asked: "Okay.  Just to be clear, no one in the courtroom looks like the guy that -- excuse me, that got out of the driver's door, because no one in the courtroom has the same type of hairstyle.  Is that what you're saying?"  Young answered: "The guy looked familiar, unless he have -- unless he had got a haircut.  That's what I'm saying."  At trial, Young explained that the one who looked familiar to her at the preliminary hearing was Jones.  Young also testified at trial that she recognized Jones from the hospital at the preliminary hearing but the change in his hair from long to short "threw [her] off" and made her unsure of identification at the hearing.

Young also testified at trial about events following the preliminary hearing, in November 2004, when the prosecutor and an investigator interviewed Young and showed her two photographs.  The photographs were police booking photographs of Jones taken a year apart.  One image was taken a month after the shooting and showed Jones with hair braids flush against his head.  The other image was taken a year before the shooting and showed Jones with a short Afro hairstyle.  Initially, the faces on the images were concealed when shown to Young, and only the hair was visible.  Young was asked if either hairstyle matched the van driver and she said no.  The prosecutor then revealed the faces on each photograph, one at a time, and asked Young if she recognized the person.  Young

said yes to both photographs: the man was the one she saw at the hospital on the night of the shooting who got out of the driver's side of the van. Young also saw that the photographs depicted the man from the preliminary hearing. However, Young insisted at trial that she remembered Jones from the hospital encounter and was not identifying him based on the photographs or previous appearances in court. Young testified that she had "no doubt" that Jones was the man she saw exiting the driver's door of the van at the hospital on the night of the shooting. On cross-examination, Young admitted a 1999 prosecution for giving false information to the police, and a 2002 conviction for grand theft.

III. ADDITIONAL PROSECUTION EVIDENCE

An Oakland police officer also placed defendant Jones in the van on the day of the shooting. Officer Keith Dodds testified that he had known Jones for years and, on the day of the shooting around 4:00 p.m., saw Jones driving a van in Oakland with at least one passenger. Officer Dodds was shown a photograph of Ridge's van, and said the van was like the one he saw Jones driving. Officer Dodds's trial testimony differed from an investigating officer's telephone log account made the day after the shooting, which stated that Dodds reported seeing Jones driving a van "within the past week" without specifying a particular day.

The prosecution also presented evidence detailing Jones's cellular telephone activity on the day of the shooting to establish his presence in the area. Cellular telephone calls are relayed by towers with a transmission radius of about seven miles, making it possible to estimate a telephone user's location and follow the user's trail as calls are placed or received. Jones lived in Stockton but call reports on Jones's cellular telephone on the day of the shooting show calls from Oakland beginning around noon. At that time of the day, calls were routed to a tower about three miles from Gilbert's house. Scores of calls were sent or received in the next eight hours, often just minutes apart. About 15 minutes before the shooting, at 8:14 p.m., a call was sent to a tower on Ashby Avenue in Berkeley. The tower is a nine-minute drive to the scene of the shooting. No calls were completed during the time of the shooting. Shortly after the shooting, at 8:54 p.m., calls were registered near Highland Hospital. From there, the cell phone calls trace a path from Oakland to Pittsburg. Jones's mother lives in Pittsburg.

IV. DEFENSE EVIDENCE

Jones presented an alibi defense. His sister and young nephew testified that Jones was at his mother's house in Pittsburg on the night of the shooting. The cellular telephone record showing calls sent and received in Oakland was explained by Jones's wife, who claimed she always used the telephone owned by her husband. Jones's wife said her

6

> husband did not have a cellular telephone for his use in April 2004. Jones's wife described various activities that took her around the San Francisco Bay Area on the night of the shooting as she made and received calls on the cellular telephone she claimed as her own. However, Jones's wife admitted on cross-examination that she was working in Stockton until at least 5:00 p.m. on the day of the shooting, and did not reach Oakland until around 7:00 p.m. The cellular telephone record shows calls from Oakland beginning around 12:00 p.m. Cross-examination also established that Jones's wife has prior felony convictions for petty theft and selling rock cocaine.
>
> Jones also presented a psychologist, Robert Shomer, Ph.D. who testified as an expert witness on eyewitness identification. Dr. Shomer testified that eyewitness identification of strangers is unreliable even under the best of circumstances. The psychologist also enumerated factors diminishing the already low reliability of eyewitness identifications, including the witness's distance from the subject; insufficient time of observation; poor lighting; sudden, stressful, or unexpected situations; lapse of time between the observation and the identification; and unduly suggestive police techniques.
>
> Dr. Shomer testified that humans are suggestible, and certain police techniques can influence an identification. Showing a witness a photograph of just one person for identification does not generate a "reliable and valid answer." A witness's stated confidence in the identification is also not reliable. Dr. Shomer explained that a witness becomes committed to a previous identification and may grow in confidence over time as the witness repeatedly sees the suspect as a defendant in court. The psychologist opined that showing photographs of a suspect to a witness after the witness failed to identify the suspect at a preliminary hearing is "unfair."
>
> Defense counsel also posited a hypothetical based upon the facts of Young's identification of defendant Jones, and asked whether the identification was worthy of confidence. The trial court sustained the prosecutor's objection that the question assumed facts not in evidence and misstated the evidence. The court remarked that the subject queried was not an appropriate subject for expert opinion.

Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *3-15.

DISCUSSION

I.  Standard of Review

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of

7

the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result.  Clark v. Murphy, 331 F.3d 1062, 1067 (9th. Cir. 2003).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision.  LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

8

If the state court only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. Lockhart v. Terhune, 250 F.3d 1223, 1230 (9th Cir. 2001). If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts. Id. at 1232.

## II. Admission of Monique Young's Identification Testimony

Petitioner asserts that the pretrial identification procedures used with prosecution witness Monique Young were so impermissibly suggestive that the admission of her identification testimony at trial violated Petitioner's due process rights under the Fourteenth Amendment of the United States Constitution. When pretrial identification procedures have been "unnecessarily suggestive and conducive to irreparable mistaken identification," due process rights may have been violated. Stovall v. Denno, 388 U.S. 293, 302 (1968). Even if pretrial procedures were unnecessarily suggestive, an identification may nonetheless be reliable under the "totality of the circumstances." Neil v. Biggers, 409 U.S. 188, 199 (1972). The factors to be considered "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200.

Neither the state trial court nor the appellate court ruled on whether the pretrial procedures used with Monique Young were overly suggestive to her identification:

> The trial court did not, as Jones represents on appeal, find "that the identification procedures used in this case were indeed unduly suggestive." The court assumed, for purposes of argument, that the procedures were unduly suggestive and proceeded to evaluate the reliability of the identification under the totality of the circumstances. We use the same approach.

Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *20 n.3. The Court, like the state courts, also assumes, for purposes of argument, that the pretrial procedures used with Monique Young were unnecessarily suggestive. The issue, then, is whether Young's identification was reliable under the factors listed in Biggers.

Regarding Young's opportunity to view the driver of the van outside the hospital, the state appellate court found:

> Young had a good opportunity to view the van driver on the night of the shooting in April 2004. The driver walked past Young toward the hospital. He passed within six feet of Young, and spoke to her in asking for a wheelchair. The driver then returned past Young with the wheelchair.

Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *20. At a February 24, 2005 evidentiary hearing to determine whether Young's identification testimony should be suppressed, Young testified that the van driver had approached her from behind, walking fast, passed within six feet of her, and asked her for a wheelchair. (Ex. 2, Reporter's Transcript Vol. 1, at 150-151.) Once he obtained a wheelchair, the van driver returned, approaching Young while pushing the wheelchair at a running pace. (Id. at 152.) When asked about the van driver's height, Young replied, "About 5'9". I'm not sure I remember. He was about like 5'9". I'm not sure I remember." (Id.) Young testified that the van driver weighed

10

1  about 180 pounds and was African-American.  (Id. at 152-153.)  When
2  asked what else she noticed, Young mentioned the van driver's hair:
3  "It was -- it looks like -- it was like, you know, when you have
4  braids you take them out, it's unbraided, off his head."  (Id. at
5  153.)  Young testified that street lights and emergency room lights
6  illuminated the area.  (Id. at 164.)  When asked how many seconds
7  it took for the van driver to approach her with the wheelchair,
8  Young was unable to make an estimate but said, "It wasn't happening
9  that quickly to where I couldn't see his face."  (Id. at 171.)
10 Asked if the driver had his head down as he pushed the wheelchair,
11 Young replied, "He was just pushing.  I don't remember him having
12 it down.  He was just pushing."  (Id. at 170.)  Although the van
13 driver was a stranger to Young and she had an opportunity to see
14 him approaching her for only a few seconds, Young's testimony at
15 the evidentiary hearing does not show that the state appellate
16 court was unreasonable in finding that Young had a good opportunity
17 to view the van driver.  Even if Young's testimony is construed to
18 show her to be a poor estimator of heights and durations, these
19 limitations do not speak to her ability to recognize faces.

20     The state appellate court did not address Young's degree of
21 attention.  Petitioner alleges that Young's degree of attention was
22 not high and that this was indicated by her testimony that she was
23 not focusing on the man's face and the fact that this was an
24 emergency situation in which she saw her primary task as reaching
25 the emergency room to inform the nurses and doctors of an incoming
26 trauma patient.  Petitioner also points to Young's inability to
27 describe Ray Gilbert, to whom she was in close proximity and whom
28 she helped stay in his wheelchair.  Petitioner concludes that

11

Young's focus was on the van driver's hairstyle rather than on his face. Young's testimony clearly indicates that the van driver's hair caught her attention, but it would be equally reasonable to conclude that this increased her degree of attention to the man as a whole rather than to conclude that the hair became the sole focus of her attention. Young's degree of attention to the van driver is inconclusive and this factor is neutral.

Addressing the accuracy of Young's first description of the van driver, the state appellate court wrote:

> Within hours of her observation, Young provided a description to the police. Young described the van driver as an African-American male of medium complexion, about 20 to 21 years old, 5 feet 8 inches tall, 175 to 180 pounds, with ear-length hair that looked like it had just been taken out of braids. [FN4] Young said that she could identify the driver if she saw him again.
>
> [FN4] Young is also African-American. "[A]n eyewitness is more accurate in identifying a person of his [or her] own race than one of another race." (People v. McDonald, 37 Cal.3d 351, 368 (1984).)
>
> Jones is an African-American male of medium complexion who was a youthful-looking 26 years old at the time of the shooting. Jones is six feet one inch tall and, one year after the shooting, weighed 165 pounds. A booking photograph of Jones taken one month after the shooting shows Jones with braided hair. [FN5]
>
> [FN5] Jones's wife confirmed at trial that Jones wore braids, and Wilhite testified that Jones's braids were undone on the night of the shooting.

Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *20-21. The court went on to characterize Young's description as "detailed and consistent with Jones's appearance." Id. at 24. Although the features specified by Young are, as Petitioner argues, impressionistic, broad, and/or mutable, they are still, as the state court found, fairly accurate. Petitioner argues that the factor of accuracy of prior descriptions should be evaluated as neutral, but the state

12

appellate court was not unreasonable in finding this a positive factor for admission of the identification evidence.

As to Young's level of certainty, she was confident, hours after her encounter with the van driver, that she would recognize him if she saw him again. Of her subsequent certainty, the state court of appeals wrote:

> While Young did not make a positive identification at the preliminary hearing in August 2004, she did express familiarity with Jones and explained that she was confused by a change in hairstyle. When first asked if anyone in the courtroom looked like the van driver, Young replied: "Um, no, because the person I['d] seen had hair on his head. So I don't remember." Young clarified that she did not see anyone who looked familiar because no one had the same type of hair. Young said, "unless one of the guys had a haircut, then [he] look[s] familiar, the face, um-hmm." Later, at the evidentiary hearing, Young explained that she recognized Jones as the van driver at the preliminary hearing but that his different hairstyle confused her.
>
> In November 2004, the prosecutor and an investigator met with Young to discuss her police statement and preliminary hearing testimony. Young provided a description of the van driver similar to her police statement but added some weight and height, and a thin mustache (which she also mentioned at the preliminary hearing). Young told the prosecutor that a person at the preliminary hearing looked familiar but his hair was much shorter.
>
> The prosecutor then showed Young two photographs of Jones, first with the faces concealed and only the hair showing, then with the faces revealed. The photographs were police booking photographs of Jones taken a year apart. One image was taken a month after the shooting and showed Jones with hair braids flush against his head. The other image was taken a year before the shooting and showed Jones with a short Afro hairstyle. With the faces revealed, Young immediately identified the images as the van driver. [FN6] Young also recognized the image showing Jones with a short Afro hairstyle as depicting the man from the preliminary hearing.
>
> [FN6] Jones says Young looked at the revealed face for a "couple of minutes" before making the identification. In fact, Young looked at the photographs for a couple of minutes before the face was revealed. Once the face was revealed, Young immediately said "that's the mustache," and "that's the guy."

13

> We find it significant, as did the trial court, that Young said she recognized Jones as the van driver at the preliminary hearing, before she was presented with the photo spread. At the evidentiary hearing, Young testified that she recognized Jones as the driver based on his mustache, skin complexion, and facial features but was "throw[n]" off by the different haircut. It is also significant that Young's description of the van driver to the police, just hours after her observation, is both detailed and consistent with Jones's appearance. After considering the totality of the circumstances, we conclude that Young's identification of defendant Jones as the van driver was reliable and that the court did not err in admitting the identification testimony at trial.

Id. at *22-24. Petitioner argues that the Court should disregard the level of certainty expressed at the suggestive exhibit of photographs because Young had already seen Petitioner at the preliminary hearing. Petitioner is correct that Young's demonstration of certainty when presented with the photographs is not relevant. However, the state appeals court focused on the certainties that are relevant: Young's certainty at the time of the events that she would be able to identify the driver and her certainty of identification at the preliminary hearing. It was not unreasonable for the state appeals court to construe Young's testimony at the preliminary hearing to indicate that Petitioner looked familiar to her and to accept her later statements that she had in fact recognized Jones as the van driver but had been confused because of the change in hairstyle. It was also not unreasonable for the court to find Young's certainty a positive factor for admission of the identification evidence.

The length of time between the crime and the confrontation is a negative factor for admission of Young's identification evidence. More than four months passed between the crime and the preliminary hearing, where Young made an indefinite identification. It was

14

another three months before the suggestive presentation of photographs and Young's definite identification. Although the Biggers Court allowed an identification made seven months after the crime, it noted that a lapse of seven months "would be a seriously negative factor in most cases." Biggers, 409 U.S. at 201. In Biggers, the Court found it significant that "the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup." Id. In the instant case, there are no analogous circumstances that relieve a lapse of seven months from being regarded a seriously negative factor.

Of the five factors that are used to determine whether, in the totality of the circumstances, an identification is reliable despite suggestive procedures, three factors favor admission of Young's identification testimony, one is neutral, and one disfavors admission. Given this evaluation of the factors, the state appellate court's decision was not contrary to, and did not involve an unreasonable application of, clearly established federal law. Admission of that testimony at Petitioner's trial did not violate Petitioner's due process rights.

III. Admission of Dr. Shomer's Expert Testimony

Petitioner alleges that restrictions placed on Dr. Shomer's testimony at trial denied Petitioner's right under the Sixth and Fourteenth Amendments to a meaningful opportunity to present a defense. During the evidentiary hearing for the motion to suppress the identification testimony, Dr. Shomer provided his expert opinion that Monique Young's identification of Petitioner was

15

inextricably linked to the suggestive procedures used.  At trial, Dr. Shomer testified about the psychology of eyewitness identification and that the techniques used with Young could affect the reliability of an identification.  Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *24-29.  During direct examination, counsel for Petitioner submitted two different hypothetical fact patterns to Dr. Shomer that resembled the suggestive procedures that preceded Young's identification testimony, though the hypothetical situations misstated the evidence.  Id. at *26-27.  In both instances, Dr. Shomer was asked his opinion about the reliability of the hypothesized identification and in both instances the trial court sustained objections made by the prosecution.  The state appellate court, applying state law, discussed the exclusion of Dr. Shomer's opinion:

> An expert witness testifying about the psychology of eyewitness identification may not offer an opinion that a particular witness at trial was or was not mistaken in his or her identification of the defendant. (McDonald, 37 Cal.3d at 362, 370.)  Defense counsel's questions improperly sought to elicit an expert opinion that Young's identification of Jones as the van driver was inaccurate and unreliable.  The long hypothetical question (which misstated the evidence, as Jones admits on appeal) is unclear but seems to ask for Dr. Shomer's opinion on whether confidence can be placed in Young's identification given her own uncertainty at the preliminary hearing.  Likewise, the question about the photo spread sought Dr. Shomer's opinion on whether Young's identification was the product of suggestion.

Ridge, 2007 Cal. App. Unpub. LEXIS 745, at *27-28.

Petitioner cites Crane v. Kentucky, 476 U.S. 683 (1986), in support of his assertion that denying him the opportunity to present Dr. Shomer's opinion about the hypothetical fact patterns violated Petitioner's right to present a defense.  However, Crane was concerned with the "blanket exclusion of the proffered

16

testimony about the circumstances of petitioner's confession," not with the exclusion of an opinion regarding an identification. Crane, 476 U.S. at 690.  Moreover, the Court made clear that it had "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted."  Id.

The Ninth Circuit, citing Crane, recently found that the Supreme Court has never "squarely addressed" whether a "well-established rule of evidence" permitting a court to exercise discretion in the admission or exclusion of expert testimony is, by its very nature, violative of the Constitution.  Moses v. Payne, 543 F.3d 1090, 1102-03 (9th Cir. 2008)(affirming the denial of a habeas corpus petition where state evidentiary rules were an issue).  Although Petitioner finds language in the dissent in Moses supportive of his claim, a dissent does not constitute clearly established federal law.  Thus, the state appeals court's affirmance of the trial court's exclusion of Dr. Shomer's answers to two hypothetical questions, relying on state law, was not contrary to, or an unreasonable application of, clearly established federal law.  The Court finds that the exclusion of Dr. Shomer's answers to these two questions did not violate Petitioner's constitutional rights.

IV.  Identification Evidence Was Not Prejudicial

Although the Court finds that the admission of Young's identification testimony and the exclusion of Dr. Shomer's answers to two hypothetical questions were not contrary to, or an unreasonable application of, clearly established federal law, a

17

different finding by the Court would not entitle Petitioner to relief unless the record demonstrated that the trial error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). In other words, Petitioner would have to establish that the error resulted in "actual prejudice." Id.

Young's testimony established that Petitioner was in the van at the hospital, after the murder had occurred; it did not identify him as a shooter. There was no dispute that, besides Gilbert, Ridge and Wilhite, there was a fourth person in the van. Thus, Young's testimony merely corroborated Wilhite's testimony, which placed Petitioner in the van shooting from the window with a rifle. Young was vigorously cross-examined about inconsistencies in her testimony and the procedures used in her identification of Petitioner as the van driver. Dr. Shomer testified about those procedures and expressed his expert opinion that they were suggestive and could lead to an unreliable identification. The jury was aware that Young had a history of uncertain credibility.

Young's testimony was not the only evidence corroborating Wilhite's testimony. A police officer testified that he saw Petitioner in the van earlier in the day of the shooting. Petitioner's cell phone records traced the route of the van to which Wilhite testified. Other evidence supported the proposition that the driver of the van was the shooter and not one of the passengers.

If Young's testimony had been excluded, or if Dr. Shomer had been permitted to answer the hypothetical questions posed to him,

18

there is no reason to believe, given the other evidence in the record, that the jury would have reached a different verdict. Thus, even if Young's testimony were allowed in error, or Dr. Shomer's answers excluded in error, Petitioner was not prejudiced.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The Clerk of the Court shall enter judgment, terminate all pending motions, and close the file.

IT IS SO ORDERED.

Dated: 7/22/09

CLAUDIA WILKEN
United States District Judge